UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MARY E. WELSH,

               Plaintiff,

      v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____

<u>DECISION & ORDER</u>

14-CV-6715P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Mary E. Welsh ("Welsh") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income Benefits and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 10).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 8, 13). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

# BACKGROUND

## I.      Procedural Background

Welsh protectively filed for SSI/DIB on April 4, 2012, alleging disability beginning on March 1, 2011, due to back pain, depression, and anxiety.  (Tr. 192-93, 207).[1]  On June 26, 2012, the Social Security Administration denied Welsh's claims for benefits, finding that she was not disabled.  (Tr. 75-98).  Welsh requested and was granted a hearing before Administrative Law Judge Joseph L. Brinkley (the "ALJ").  (Tr. 39, 107-08, 128-54).  The ALJ conducted a hearing on January 15, 2013.  (Tr. 39-74).  Welsh was represented at the hearing by her attorney Ida Comerford, Esq.  (Tr. 39).  In a decision dated April 9, 2013, the ALJ found that Welsh was not disabled and was not entitled to benefits.  (Tr. 17-29).

On October 31, 2014, the Appeals Council denied Welsh's request for review of the ALJ's decision.  (Tr. 1-6).  Welsh commenced this action on December 19, 2014, seeking review of the Commissioner's decision.  (Docket # 1).

## II.     Relevant Medical Evidence[2]

### A.      Treatment Records

Treatment notes indicate that Welsh was brought to the emergency room at Clifton Springs Hospital ("Clifton Springs") on Monday, February 4, 2008 by her parents.  (Tr. 401-27).  Treatment notes indicate that Welsh had told her school counselor that she had ingested six Prozac tablets and five Benadryl tablets on Saturday, February 1, 2008.  (*Id.*).  Welsh had reportedly had a disagreement with her parents, after which she took the pills.  (*Id.*).

---

[1]  The administrative transcript shall be referred to as "Tr. ___."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.  Welsh does not challenge the ALJ's physical RFC assessment.  Thus, records pertaining to Welsh's physical impairments are not summarized herein.

Welsh was able to participate in normal activities on Sunday and to go to school on Monday, but her counselor recommended taking her to the hospital after learning of the pill ingestion. (*Id.*). At the time, Welsh lived with her mother and was in the eleventh grade. (*Id.*). She was diagnosed with depressive disorder, not otherwise specified by history, and assessed to have a Global Assessment Functioning ("GAF") of 54. (*Id.*). It was recommended that she continue outpatient mental health treatment and, in the interim, that she attend an appointment with the Finger Lakes Comprehensive Psychiatric Emergency Program ("CPEP"). (*Id.*). On February 6, 2008, Welsh's mother contacted Clifton Springs and informed the hospital that the CPEP appointment was not necessary. (*Id.*).

On March 5, 2009, Welsh attended an appointment with her primary care physician, John D'Amore ("D'Amore"), MD. (Tr. 339-40). Treatment notes indicate that Welsh had a history of Attention Deficit Hyperactivity Disorder ("ADHD"), depression, and insomnia. (*Id.*). According to the treatment notes, Welsh was living with her mother, working full-time at Walmart, and planning to attend college. (*Id.*). She was also being treated by a psychiatrist, who had prescribed Benadryl to help her sleep. (*Id.*).

On September 24, 2009, Welsh returned for another appointment with D'Amore and complained of difficulty falling asleep. (Tr. 343-44). Welsh reported that she had previously tried melatonin without success and was currently under stress and experiencing a low mood due to a breakup with her boyfriend. (*Id.*). D'Amore prescribed Trazodone to assist with sleep. (*Id.*).

On July 21, 2010, Welsh visited D'Amore as a follow-up to an emergency room visit. (Tr. 361-62). Welsh reported that five days earlier she had woken in the middle of the night shaking uncontrollably. (*Id.*). The episode lasted approximately three minutes before

subsiding, and Welsh was conscious for the entire episode.  (*Id.*).  After the episode, Welsh

continued to feel tingling in her fingers, and her heart was pounding.  (*Id.*).  Welsh was able to

speak coherently, went back to sleep, and felt fine the next morning.  (*Id.*).  She went to an

amusement park the following day, but when she arrived home her family convinced her to go to

the emergency room.  (*Id.*).  She was evaluated at Strong Memorial Hospital ("Strong").  (*Id.*).

Testing at Strong revealed a normal CT scan of her head and that she was pregnant.  (*Id.*).  She

reported that she ceased taking Trazadone due to her pregnancy and was worried about how that

would affect her sleep.  (*Id.*).  She also reported experiencing panic attacks characterized by

shortness of breath and a frightening sensation.  (*Id.*).  She had experienced a panic attack the

night before her shaking episode.  (*Id.*).  She denied any symptoms of depression.  (*Id.*).

D'Amore thought that the episode was more likely a panic attack than a seizure.  (*Id.*).

On March 28, 2011, shortly after giving birth, Welsh returned for an appointment

with D'Amore.  (Tr. 367-68).  Welsh was interested in restarting Trazodone to assist with sleep.

(*Id.*).  She denied any depressive symptoms.  (*Id.*).  D'Amore prescribed the Trazodone, but

advised her about its use while lactating.  (*Id.*).

On August 17, 2011, Welsh attended an appointment with D'Amore.

(Tr. 372-73).  She reported that she had been seeing a counselor for postpartum depression and

that she had scheduled an appointment with a psychiatrist at Boike Counseling ("Boike").  (*Id.*).

Her counselor had recommended that she start treatment with an antidepressant.  (*Id.*).  D'Amore

prescribed Fluoxetine.  (*Id.*).

On February 22, 2012, Welsh went to the emergency department at Clifton

Springs because she was "having a hard time dealing with stuff."  (Tr. 430-43).  She reported an

increase in depressive symptoms due to financial stressors, a sick infant, and her fiancée's mental

health issues. (*Id.*). She reported that she was receiving treatment from Angela Wright

("Wright"), a counselor at Boike, but felt that she needed something more intensive. (*Id.*).

According to Welsh, she had suffered from post-partum depression that had not been alleviated,

but denied hallucinations or suicidal ideations. (*Id.*). She reported that she lived with her son,

fiancée, mother, and grandmother. (*Id.*). She was assessed to suffer from depressive disorder,

not otherwise specified, and to have a current GAF of 52. (*Id.*). It was recommended that she

attend an appointment with CPEP and then follow up with Wright at Boike. (*Id.*).

On February 24, 2012, Stanko Rodic ("Rodic") went to Welsh's residence to

conduct the CPEP appointment. (Tr. 442-43). Welsh reported that she was doing well and had

gone to the emergency room shortly after an appointment with Dr. Marino at Boike. (*Id.*).

According to Welsh, during her appointment with Marino, she found herself unable to

communicate with him and she left the appointment; because she wanted to talk to someone else

before going home, she went to the emergency room. (*Id.*). She reported that she treated with

Wright biweekly, but had stopped seeing her during the holiday season and had only recently

recommenced treatment. (*Id.*). She also attended appointments with Marino monthly. (*Id.*).

According to Welsh, Marino had recently increased her medication because she had been

experiencing increased depressive symptoms, including crying, feelings of agitation, and lack of

energy or motivation. (*Id.*). Rodic assessed that Welsh was cooperative, slightly manipulative,

and had normal speech, focused thought content, organized thought process, normal judgment,

full orientation, and intact memory. (*Id.*). He observed that her mood was slightly annoyed and

discouraged and her attention span was distractible due to her son. (*Id.*). Rodic diagnosed her

with depressive disorder, not otherwise specified, and assessed a GAF of 53. (*Id.*). He advised

her to follow up with Wright at her upcoming appointment. (*Id.*).

On April 5, 2012, Welsh returned for an appointment with D'Amore.
(Tr. 377-78).  She informed D'Amore that she wanted to work, but that if she did so she would
have to pay for daycare.  (*Id.*).  She also complained that she was prevented from working due to
back pain and depression and anxiety over leaving her child.  (*Id.*).  D'Amore opined that her
back pain would improve with exercise and weight loss and that she should continue to receive
psychiatric treatment.  (*Id.*).

On June 18, 2012, Welsh attended an appointment with D'Amore following a
visit to the emergency room the previous evening.  (Tr. 379).  Welsh reported that she went to
the emergency room because she felt shaky, anxious, dizzy, and had blurred vision.  (*Id.*).  She
reported experiencing anxiety and that her psychiatrist had prescribed Abilify, which seemed to
help at lower dosages, but increased her anxiety at higher dosages.  (*Id.*).  Her psychiatrist
advised her to reduce her dosage and prescribed Xanax.  (*Id.*).  The emergency room physician
believed that her symptoms stemmed from anxiety and advised her to follow up with her primary
care physician.  (*Id.*).  D'Amore assessed that Welsh suffered from anxiety disorder with no
evidence of underlying physical abnormalities and recommended that she contact her
psychiatrist.  (*Id.*).

On July 11, 2012, Welsh called Clifton Springs to request a mobile crisis
appointment.  (Tr. 304-07).  Welsh reported that she had broken up with her fiancée and was
now a single mother and needed a place to live.  (*Id.*).  She said that she was being treated at
Boike and was experiencing suicidal ideation without a plan or intent.  (*Id.*).  Welsh stated that
she believed she could keep herself safe if CPEP could not schedule an appointment until the
following day.  (*Id.*).

Clifton Springs contacted Wright, who reported that Welsh was overwhelmed and likely looking for an inpatient stay as an escape. (*Id.*). Wright reported that Welsh's stressors included her relationship, caring for an ill grandparent, being a single parent, finances, and lack of support. (*Id.*). According to Wright, Welsh's psychiatrist had determined that she did not require inpatient mental health treatment. (*Id.*). Wright opined that Welsh suffered from situational depression and was currently taking Prozac and Xanax. (*Id.*). Wright felt that it would be more therapeutic for Welsh if the CPEP appointment took place the following day. (*Id.*). Clifton Springs contacted Welsh and scheduled a CPEP appointment for the following day. (*Id.*). Welsh agreed and scheduled an appointment for 10:00 a.m. because she wanted to "sleep in," but asked whether she could go to the hospital if she felt unsafe. (*Id.*). She was informed that she could go to the hospital under those circumstances. (*Id.*).

Later that day Welsh went to the emergency room for a mental health evaluation. (Tr. 317-21). She reported having suicidal thoughts over the previous few weeks and experiencing difficulty caring for her infant son. (*Id.*). According to Welsh, she had broken up with her boyfriend a few days earlier because they both were having suicidal thoughts and she felt that it would be best if they separated. (*Id.*). She reported that she did not want to be alone and that she was having thoughts of cutting herself. (*Id.*). She reported a recent medication change and that she had been attempting to obtain disability benefits due to chronic back pain, depression, and anxiety. (*Id.*). Welsh was advised to follow up with CPEP and to return to the emergency room if her symptoms worsened. (*Id.*).

On July 13, 2012, Jeremy Smith ("Smith") met with Welsh at her home to conduct the CPEP appointment. (Tr. 322-23). Welsh reported feeling overwhelmed due to caring for her son and her grandmother, who suffered from dementia. (*Id.*). She reported a

recent medication change by her psychiatrist and that she was having thoughts of cutting herself, but did not actually want to harm herself. (*Id.*). Smith observed that Welsh was appropriately groomed and cooperative. (*Id.*). According to Smith, Welsh had a goal-directed thought process and specific goals of speaking to her attorney concerning disability benefits, enrolling in school, cleaning her house, and attending more therapy sessions. (*Id.*). She also demonstrated appropriate thought content, average level of intelligence, normal judgment, full orientation, intact memory, and appropriate affect. (*Id.*). Her attention span fluctuated depending upon the topic and whether her grandmother needed care. (*Id.*). Smith diagnosed Welsh with depressive disorder and bipolar disorder and assessed a GAF of 55. (*Id.*). He advised Welsh to follow up with her therapist at Boike. (*Id.*).

On July 17, 2012, Welsh went to the emergency room at Strong for increasing depression and thoughts of self-harm. (Tr. 328-31, 490-93). She reported home stressors, including a recent breakup with her boyfriend, care for her sick grandmother, financial strain, and care for her young son. (*Id.*). She indicated that she received treatment at Boike, but wanted to be admitted to the hospital for a medication adjustment. (*Id.*). Her mother was with her and confirmed that Welsh had been suffering from depression. (*Id.*). She was discharged with instructions to follow up with her mental health providers at Boike and to attend an appointment with Strong's Adult General Partial Hospitalization Program on July 25, 2012. (*Id.*).

On July 25, 2012, Welsh attended an intake appointment at Strong. (Tr. 477-89). She reported a history of depression and intermittent mental health treatment, as well as an overdose while in high school. (*Id.*). Welsh stated that she became very depressed, overwhelmed, and had thoughts of suicide following a recent breakup with her boyfriend. (*Id.*). She reported low motivation, disturbed sleep and appetite, and difficulty caring for her child.

(*Id.*).  She was diagnosed with depressive disorder, not otherwise specified, anxiety disorder, not otherwise specified, and was assessed to have a GAF of 38.  (*Id.*).  She was admitted for treatment in the partial hospitalization program.  (*Id.*).

On July 30, 2012, Welsh attended a therapy session with Peter Teall ("Teall"), LCSW-R, at Strong.  (Tr. 503-21).  She reported some improvement in her depression and anxiety and that she had not had any suicidal ideation during the previous few days.  (*Id.*).  According to Welsh, she rated her depression and anxiety each at a level five on a scale of one to ten for the previous four weeks.  (*Id.*).  She reported that she had urges to take a week's vacation.  (*Id.*).  She also reported poor sleep and that she had been binging on junk food.  (*Id.*).  She also reported experiencing panic attacks two or three times each month.  (*Id.*).

On July 31, 2012, Welsh met with Patricia Mangarelli ("Mangarelli"), NP, at Strong.  (Tr. 522-29).  She reported that her current request for help stemmed from the termination of her relationship with her boyfriend, who is the father of her child.  (*Id.*).  She stated that she is not used to being alone, which prompted her to seek help from CPEP.  (*Id.*).  According to Welsh, she was able to visit her son the previous day and realized that she wanted to continue to be a mother and that she wanted to enroll in school.  (*Id.*).  She reported depression and a recent medication change that had aggravated her anxiety.  (*Id.*).  Welsh also admitted that she had been inconsistent with taking her prescribed dosage of Prozac and that she was out of Xanax.  (*Id.*).  She reported difficulty cleaning and managing her personal hygiene.  (*Id.*).  Mangarelli noted that Welsh had reportedly been sleeping well and had not had any panic attacks during the previous two weeks, yet had requested more Xanax.  (*Id.*).  Additionally, Welsh informed Mangarelli that she might not want to continue the program because she did not think that group therapy was beneficial to her.  (*Id.*).  Mangarelli advised Welsh to continue taking

Prozac and prescribed Hydroxyzine for anxiety.  (*Id.*).  Welsh discharged herself from the program.  (Tr. 514).

On November 7, 2012, Welsh drove herself to the emergency room at Clifton Springs and indicated that she had taken Benadryl pills, although she was unable to quantify how many she had taken.  (Tr. 444-50).  She reported taking the pills after arguing with her mother. (*Id.*).  She was admitted to the hospital for a psychiatric evaluation.  (*Id.*).

Welsh met with Douglas Landy ("Landy"), MD.  (Tr. 451-52).  According to Landy, Welsh had voluntarily gone to the emergency room after ingesting pills following an argument with her boyfriend and her mother.  (*Id.*).  Welsh appeared somewhat sedated from the medication and reported that she no longer had thoughts of wanting to harm herself and that she wanted to go home.  (*Id.*).  Welsh's mother, who was at the appointment, indicated that Welsh had been eating and sleeping more and seemed more depressed.  (*Id.*).  Welsh reported that she lived with her mother and son and was enrolled in college.  (*Id.*).

On November 12, 2012, Landy discharged Welsh from Clifton Springs.  (*Id.*). Landy noted that although Welsh had indicated on the day after her admission that she was not suicidal, he thought it would be prudent to monitor her for a few days considering her apparent ingestion of pills and her history of increasing depression.  (*Id.*).  At discharge, Welsh reported that she was not suicidal and was instructed to follow up with Wright.  (*Id.*).  She was diagnosed with depressive disorder, not otherwise specified, delirium due to medication overdose, and assessed to have a GAF of 45.  (*Id.*).

On December 7, 2012, Welsh presented at Four Winds for inpatient psychiatric treatment.  (Tr. 545-56).  She was accompanied by her mother.  (*Id.*).  Welsh indicated that she had been decompensating from severe symptoms of depression, anxiety, mood lability, and

self-destructive impulsivity.  (*Id.*).  She reported two previous overdose attempts, the most recent

having occurred in November 2012.  (*Id.*).  Welsh reported that she struggles to care for her son

and requires her mother's assistance, was unemployed, and had been enrolled in school but

dropped out due to her symptoms.  (*Id.*).  Welsh reported a variety of symptoms, including

periods of insomnia, rapid mood swings, low self-esteem, coping deficits, and an inability to

control her impulses, including spending and promiscuity.  (*Id.*).  Upon admission, she was

diagnosed with bipolar disorder, not otherwise specified, generalized anxiety disorder, and rule

out post-traumatic stress disorder.  (*Id.*).  She was assessed to have a GAF of 16.  (*Id.*).

Welsh was discharged from Four Winds on December 27, 2012.  (Tr. 563-66).

The discharge notes indicate that she received treatment from Harriet Rebenstein, LCSW, and

Adrian Morris, MD.  (*Id.*).  According to the notes, Welsh came to the facility after researching

the effects of electroconvulsive therapy ("ECT") and because she was interested in pursuing that

course of treatment.  (*Id.*).  Welsh participated in individual therapy sessions three times each

week and began to respond to the ECT treatments.  (*Id.*).  She also attended groups and

programming.  (*Id.*).  Welsh was instructed to follow up with her outpatient providers and to take

her medications as prescribed.  (*Id.*).  She was diagnosed with Bipolar I disorder, most recent

episode mixed, severe with psychotic features, and was assessed to have a GAF of 55 at

discharge.  (*Id.*).  Welsh was told not to drive for two weeks following her last ECT treatment on

December 26, 2012.  (*Id.*).

B.   **Angela Wright – Boike Counseling**

In response to a request for information by Welsh's attorney, Wright provided a

letter summarizing Welsh's treatment history at Boike.  (Tr. 569-70).  She indicated that Welsh

first began treatment on February 11, 2008 and was still receiving treatment at Boike.  (*Id.*).

According to Wright, Welsh first presented with complaints of depression and anxiety, including panic attacks.  (*Id.*).  She reportedly felt hopeless, lacked ambition and goals, and had difficulty concentrating and focusing.  (*Id.*).

According to Wright, Welsh complained of struggles at school and difficulty maintaining employment.  (*Id.*).  Wright indicated that Welsh had very low self-worth and self-esteem.  (*Id.*).  Wright reported that Welsh's symptoms had increased recently, prompting several visits to the emergency room with complaints of suicide and thoughts of cutting.  (*Id.*).  Wright noted that Welsh had not acted on these thoughts.  (*Id.*).  Wright also reported that Welsh had recently received inpatient treatment for three weeks, which involved six ECT treatments.  (*Id.*).  According to Wright, Welsh reported that the treatments had been helpful, but she continued to experience depression and anxiety.  (*Id.*).  Wright stated that Welsh continued to feel lethargic, lacked direction and goals, and was experiencing difficulty performing routine household tasks and personal hygiene.  (*Id.*).  Additionally, according to Wright, Welsh continued to struggle with focus, concentration, and memory.  (*Id.*).

Wright diagnosed Welsh with Bipolar II disorder, dependent personality disorder, and assessed her GAF to be 50.  (*Id.*).  She also indicated that Welsh had reported that her psychiatrist had recommended additional ECT treatments.  (*Id.*).

Wright concluded the letter with the invitation, "If you have any further questions or concerns please call me."  (*Id.*).

C.     **Kavitha Finnity, PhD**

On June 4, 2012, state examiner Kavitha Finnity ("Finnity"), PhD, conducted a consultative psychiatric evaluation.  (Tr. 296-99).  Welsh reported that she lived with her boyfriend, mother, grandmother, and fifteen-month-old son.  (*Id.*).  Welsh reported she had

obtained her GED in 2008, was currently unemployed, and cared for her grandmother, who suffered from dementia.  (*Id.*).  Welsh reported no history of psychiatric hospitalization, although she reportedly saw Wright, her therapist, every two weeks and received medication management from Marino on a monthly basis.  (*Id.*).

According to Welsh, she experienced difficulty sleeping and an increased appetite.  Welsh reported depressive symptoms, depressed mood, crying, hopelessness and irritability, loss of interest, loss of energy, and social withdrawal.  (*Id.*).  She reported thoughts of suicide, but no current plan or intent.  (*Id.*).  She also reported excessive anxiety with restlessness and feelings of paranoia.  (*Id.*).  Welsh indicated that she was able to care for her personal hygiene, cook, shop, manage her money, and drive.  (*Id.*).  Welsh also reported that she socialized with friends and had a good relationship with her family, but did not have any hobbies.  (*Id.*).

Upon examination, Finnity noted that Welsh appeared appropriately dressed and well-groomed, with normal gait, motor behavior, posture, and eye contact.  (*Id.*).  Finnity opined that Welsh had fluent, clear speech with adequate language, coherent and goal-directed thought processes, depressed affect, dysthymic mood, clear sensorium, full orientation, and average intellectual functioning with a general fund of information appropriate to her experience.  (*Id.*).  Finnity noted that Welsh's attention and concentration were intact.  (*Id.*).  Finnity found that Welsh's recent and remote memory skills were impaired.  (*Id.*).  According to Finnity, Welsh could recall three out of three objects immediately and zero out of three objects after five minutes, and could complete five digits forward and zero backwards.  (*Id.*).

According to Finnity, Welsh could follow and understand simple directions, perform simple tasks, maintain attention and concentration, maintain a regular schedule, learn

new tasks, perform complex tasks, and make appropriate decisions.  (*Id.*).  Finnity also opined

that Welsh had some difficulty relating with others and was unable to deal with stress.  (*Id.*).

According to Finnity, Welsh could manage her own finances, and her prognosis was fair to good.

(*Id.*).

### D.    T. Inman-Dundon, Psychology

On June 26, 2012, agency medical consultant Dr. T. Inman-Dundon

("Inman-Dundon") completed a Psychiatric Review Technique.  (Tr. 79-80).  Inman-Dundon

concluded that Welsh's mental impairments did not meet or equal a listed impairment.  (*Id.*).

According to Inman-Dundon, Welsh suffered from mild limitations in her activities of daily

living and her ability to maintain social functioning, and moderate limitations in her ability to

maintain concentration, persistence or pace.  (*Id.*).  In addition, according to Inman-Dundon,

Welsh had not suffered from repeated episodes of deterioration.  (*Id.*).  Inman-Dundon

completed a mental Residual Functional Capacity ("RFC") assessment.  (Tr. 81-83).

Inman-Dundon opined that Welsh suffered from moderate limitations in her ability to remember

locations and work-like procedures, understand and remember detailed instructions, carry out

detailed instructions, complete a normal workday and workweek without interruptions from

psychologically-based symptoms, accept instructions, respond appropriately to criticism from

supervisors, and respond appropriately to changes in the work setting.  (*Id.*).

### E.    Michelle Stouffer, NPP

On November 29, 2012, Michelle Stouffer ("Stouffer"), NPP, completed a

medical examination for employability assessment regarding Welsh's ability to perform

work-related activities, the relevant portions of which are discussed herein.  (Tr. 333-34).

Stouffer indicated that Welsh had been diagnosed with depressive disorder, not otherwise

specified, and anxiety disorder, not otherwise specified, and assessed a GAF of 38.  (*Id.*).  At the

time of the assessment, Welsh was participating in the partial hospitalization program at Strong.

(*Id.*).  Stouffer opined that Welsh was moderately limited in her ability to understand and

remember instructions, carry out instructions, function in a work place at a consistent pace, and

was very limited in her ability to maintain attention and concentration.  (*Id.*).  She opined that

Welsh was unable to work while she was stabilizing her mental health symptoms and that it was

possible that her inability to work might last more than ninety days, although a reassessment in

ninety days would be necessary to reach that conclusion.  (*Id.*).  Stouffer opined that Welsh's

mental impairments had been severe over the past year, but that they might stabilize within the

year.  (*Id.*).


III.     <u>Non-Medical Evidence</u>

          In her application for benefits, Welsh indicated that she had been born in 1990

and had obtained her GED in June 2008.  (Tr. 173, 208).  Welsh reported that she had previously

been employed as a busser in a restaurant, a cashier, a dishwasher, and a sales floor associate.

(Tr. 208).  Welsh reported that she experienced anxiety after she became pregnant in July 2010

and that she suffers panic attacks characterized by rapid heartbeat, fast breathing, difficulty

breathing, and crying on a monthly basis.  (Tr. 218).  According to Welsh, her symptoms last for

approximately fifteen to thirty minutes, and she typically needs to leave her current situation in

order to calm herself down.  (Tr. 218-19).  She also reported difficulty socializing with others.

(Tr. 219).

          During the administrative hearing, Welsh testified that she was twenty-two years

old and lived with her mother and her nearly two-year-old son.  (Tr. 45-46).  Welsh indicated

that she had completed the tenth grade and had obtained her GED in 2008.  (Tr. 46).  Welsh

testified that she had dropped out of high school due to mental health difficulties.  (Tr. 47).

Welsh testified that she was a licensed driver, although she had not driven to the hearing.

(Tr. 48).

      Welsh testified that her primary health issue was anxiety.  (Tr. 50).  Welsh

explained that she gets very nervous and struggles to perform daily household chores and to care

for her son.  (Tr. 51).  According to Welsh, she becomes overwhelmed, even by dishwashing.

(Tr. 59).  She also testified that she suffers from panic attacks lasting about ten minutes

approximately twice a week.  (Tr. 56).  According to Welsh, the panic attacks are characterized

by a tingling sensation and difficulty breathing.  (*Id.*).  She was unable to identify a specific

trigger for her attacks, which she experiences both at home and in public.  (*Id.*).

      She also becomes overwhelmed in larger groups, even with her family.  (Tr. 57).

According to Welsh, she sometimes has thoughts of hurting herself and has overdosed on two

occasions.  (*Id.*).  Welsh testified that she has difficulty with memory and concentration.

(Tr. 58-59).  According to Welsh, her last overdose was intentional and was precipitated by her

breakup with her child's father.  (Tr. 63).  Welsh was enrolled in college in September of 2012,

but had to drop out after approximately one month because the course load was too demanding.

(*Id.*).

      According to Welsh, she has been receiving mental health treatment from Wright

and Marino at Boike since at least 2008.  (Tr. 50-51, 65-66).  Welsh stated that Wright lets her

talk about everything and provides guidance to process her feelings.  (Tr. 52).  According to

Welsh, her mental health prescription medications include Effexor, Bupropin and Risperdal.

(Tr. 53).  She voluntarily admitted herself to Four Winds for three weeks, where she received

ECT treatments.  (*Id.*).  Welsh testified that she learned coping skills and strategies while at Four

Winds.  (Tr. 61).  According to Welsh, the ECT treatments helped, but caused some side effects

including impaired memory and judgment.  (Tr. 53).  Due to the ECT treatments and a recent

death in her family, Welsh testified that she was not currently driving.  (Tr. 54).

Welsh also testified that she attended a partial hospitalization program at Strong.

(*Id.*).  According to Welsh, she was referred to the day program after suffering a panic attack and

going to the emergency room.  (Tr. 54, 61).  While in the program, Welsh received group therapy

and medication management.  (Tr. 62).  Welsh reported that she has been to the emergency room

approximately five times due to mental instability.  (Tr. 55).  Welsh testified that the mobile

crisis unit and Child Protective Services have visited her house to monitor her mental status.

(*Id.*).

Welsh testified that she is able to go to the grocery store or the mall on good days,

which she has "a good portion of the month."  (Tr. 57).  On a typical day, Welsh sleeps until the

afternoon and then attends a doctor's appointment, has lunch with her mother, and watches

television.  (Tr. 64).  She typically goes to bed around midnight and has difficulty falling asleep

due to racing thoughts.  (*Id.*).

Vocational expert Peter Manzi ("Manzi") also testified during the hearing.

(Tr. 66-73).  The ALJ first asked Manzi to characterize Welsh's previous employment.

(Tr. 71-72).  The ALJ then asked Manzi whether a person would be able to perform Welsh's

previous jobs who was the same age as Welsh, with the same educational and vocational profile,

and who was able to perform the full range of light work, but was limited to frequent pushing,

pulling, handling, fingering, and feeling, occasional balancing, kneeling, stooping and climbing

of ramps and stairs, and no crawling, crouching, or climbing ladders, ropes or scaffolds, who

must avoid exposure to environmental factors and could only perform simple, routine, repetitive

tasks requiring superficial contact with the public, coworkers and supervisors and only

occasional team or tandem work, and no production quota or assembly line work.  (Tr. 69-71).

Manzi testified that such an individual would not be able to perform Welsh's past relevant work,

but would be able to perform positions available in the national and local economy, including the

positions of collator operator, laundry sorter, and photocopy machine operator.  (*Id.*).

The ALJ then asked Manzi to assume an individual with the same limitations,

except that she was limited to occasional pushing, pulling, fingering, and feeling with her upper

extremities bilaterally, and was unable to perform even low stress jobs.  (Tr. 72).  Manzi testified

that such an individual would be precluded from competitive employment.  (*Id.*).

Welsh's attorney then asked Manzi to assume an individual with the same

limitations as the first hypothetical, but to assume also that the individual was occasionally

unable to remember, understand or carry out instructions, frequently unable to maintain attention

and concentration, and occasionally unable to function in a work setting at a consistent pace.

(Tr. 72-73).  Manzi testified that such an individual would be precluded from competitive

employment.  (*Id.*).

## **DISCUSSION**

### I.    **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the

decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also*

*Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo*

whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's

conclusions are supported by substantial evidence in the record as a whole or are based on an

erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C.

§ 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by

"substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to

any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

   To determine whether substantial evidence exists in the record, the court must

consider the record as a whole, examining the evidence submitted by both sides, "because an

analysis of the substantiality of the evidence must also include that which detracts from its

weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

(1)  whether the claimant is currently engaged in substantial gainful activity;

(2)  if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)  if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)  if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)  if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.      **The ALJ's Decision**

In his decision, the ALJ applied the five-step analysis for evaluating disability claims. (Tr. 17-29).  Under step one, the ALJ found that Welsh had not engaged in substantial gainful activity since March 1, 2011, the alleged onset date. (Tr. 19).  At step two, the ALJ concluded that Welsh had the severe impairments of obesity, diabetes mellitus, bipolar disorder, depression, and anxiety disorder.  (*Id.*).  At step three, the ALJ determined that Welsh did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments. (Tr. 19-21).  With respect to Welsh's mental impairments, the ALJ found that Welsh suffered from mild difficulties in performing daily activities and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 20).  The ALJ also concluded that Welsh had experienced one episode of decompensation of extended duration.  (*Id.*).  The ALJ concluded that Welsh retained the ability to perform simple, routine and repetitive jobs requiring a light exertional level, including the ability to occasionally lift and carry up to twenty pounds and frequently lift and carry up to ten pounds, except that she could only frequently push, pull, handle, finger, and feel with her bilateral upper extremities, occasionally climb ramps and stairs, balance, kneel and stoop, and could not crawl, crouch or climb ladders, ropes or scaffolds, must avoid exposure to environmental irritants and work place hazards, and is limited to low stress jobs without production quotas or assembly lines involving simple, routine, repetitive tasks and superficial contact with the general public, coworkers, and supervisors, and could only occasionally engage in team or tandem work.  (Tr. 21).  At step four, the ALJ determined that Welsh was unable to perform her former work.  (Tr. 28).  Finally, at step five, the ALJ concluded that Welsh could perform other jobs that existed in the local and

national economy, including collator operator, laundry sorter, and photocopy machine operator.
(Tr. 29).  Accordingly, the ALJ found that Welsh is not disabled.  (*Id.*).

   B.   **Welsh's Contentions**

   Welsh contends that the ALJ's determination that she is not disabled is not
supported by substantial evidence.  (Docket # 8-1).  First, Welsh contends that the ALJ failed to
develop the record because he did not make additional efforts to obtain treatment records from
Boike, which provided mental health treatment to Welsh for at least five years.  (*Id.* at 23-26).
According to Welsh, this error was especially harmful because it created a gap in the record, and
the ALJ then used that gap in discounting Stouffer's opinion and Wright's letter.  (*Id.*).
Additionally, Welsh maintains that the ALJ's mental RFC assessment is flawed because it is
based upon the ALJ's lay assessment of the treatment records.  (*Id.* at 26-30).


II.   **Analysis**

   "It is well established in the Second Circuit that an ALJ is under an obligation to
develop the administrative record fully, to ensure that there are no inconsistencies in the record
that require further inquiry, and to obtain the reports of treating physicians and elicit the
appropriate testimony during the proceeding."  *Martello v. Astrue*, 2013 WL 1337311, *3
(W.D.N.Y. 2013).  Given the non-adversarial nature of a Social Security hearing, "[t]he duty of
the ALJ, unlike that of a judge at trial, is to 'investigate and develop the facts and develop the
arguments both for and against the granting of benefits.'"  *Vincent v. Comm'r of Soc. Sec.*, 651
F.3d 299, 305 (2d Cir. 2011) (quoting *Butts*, 388 F.3d at 386).  Accordingly, before determining
whether the ALJ's conclusions are supported by substantial evidence, courts must first evaluate
whether the claimant was provided a full hearing "in accordance with the beneficent purposes of

the [Social Security] Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755

(2d Cir. 1982); *see also Archbald v. Colvin*, 2015 WL 7294555, *3 (E.D.N.Y. 2015) ("[t]he

reviewing court must ensure that 'all of the relevant facts [are] sufficiently developed and

considered'") (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 509 (2d Cir. 2009), *cert.*

*denied*, 559 U.S. 962 (2010)).  The fact that a claimant is represented during the administrative

hearing does not relieve the ALJ of his duty to develop the record.  *See Moran v. Astrue*, 569

F.3d 108, 112 (2d Cir. 2009) ("it is the well-established rule in our circuit" that such a duty exists

"[e]ven when a claimant is represented by counsel").

Welsh maintains that the ALJ erred by failing to obtain her treatment records

from Boike, although a review of the record demonstrates that those records were requested at

the administrative level (Tr. 78, 89), and Welsh's attorney indicated during the hearing that she

would be submitting a summary of the records in lieu of the treatment records (Tr. 50).

Significantly, Welsh's attorney never requested the ALJ's assistance in obtaining the full

treatment records, nor did she request that the ALJ hold the record open so that they could be

obtained.  Although the treatment records undoubtedly would have been helpful to the ALJ's

determination, it is difficult to conclude that the ALJ failed to fulfill his duty on this basis alone.

*See Lynn v. Comm'r of Soc. Sec.*, 2013 WL 1334030, *13 (E.D.N.Y. 2013) (ALJ "entitled to

make a decision based on the available record" where he requested psychiatric records, allowed

their submission, and claimant made no requests for additional time); *see also Gabrielsen v.*

*Colvin*, 2015 WL 4597548, *5 (S.D.N.Y. 2015) ("[t]he regulations that now control, 20 C.F.R.

§§ 404.1520b(c)(1) and 416.920b(c), provide that re-contacting the treating physician is an

*option* for correcting inconsistencies in the record").

Although I do not find that the ALJ erred by not making additional efforts to obtain the treatment notes, I agree with Welsh that the ALJ was not permitted to draw any adverse inferences against Welsh because the records had not been submitted. *See Jones v. Colvin*, 2015 WL 4628972, *5 (W.D.N.Y. 2015) (ALJ improperly drew adverse inference against claimant due to lack of treating physician opinion where the ALJ never requested an opinion from the treating physician) (citing *Jermyn v. Colvin*, 2015 WL 1298997, *20 (E.D.N.Y. 2015) ("[i]nstead of developing the record, the ALJ reached his RFC conclusion based, in part, on the absence of this information in the record[;] . . . the ALJ was not permitted to construe the silence in the record . . . as indicating support for his determination as to [p]laintiff's limitations")).  In other words, the ALJ should not have discounted the information contained in Wright's letter in the absence of either the treatment notes or clarification from Wright, which the letter indicates Wright was willing to provide.  *See Gabrielsen v. Colvin*, 2015 WL 4597548 at *6 (despite change in regulations governing duty to re-contact treating physician, "courts in the Second Circuit have concluded, citing these regulations, that the ALJ still has an obligation to re-contact the treating physician in some cases") (citing *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) and *Ashley v. Comm'r of Soc. Sec.*, 2014 WL 7409594, *4 (N.D.N.Y. 2014)).  The portion of the ALJ's decision that discusses Wright's submission does not make clear whether and, if so, the extent to which the ALJ credited or discounted the information contained in Wright's submission.

Wright's letter suggests, and portions of the administrative record demonstrate, that Welsh's mental health steadily deteriorated beginning in mid-July 2012.  Between July 2012 and the hearing in January 2013, Welsh visited the emergency room on three separate occasions, fearing for her safety due to her mental status.  On one of those occasions, she was admitted to

the hospital due to an apparent overdose.  Also during that time, a mobile crisis unit conducted

an interview at Welsh's residence, CPS conducted an investigation based upon Welsh's apparent

overdose, Welsh was referred for a partial hospitalization program, and she was admitted for

three weeks of inpatient mental health treatment.  According to Wright, during her inpatient stay,

Welsh was administered six ECT treatments and additional ECT treatments were recommended.

According to Wright, despite these interventions, Welsh continued to experience depression,

anxiety, and difficulty with memory, focus and concentration.

      Although not entirely clear, the ALJ's decision suggests that he discounted or did

not credit the information in Wright's letter because her treatment notes were not contained in

the record and because the information was based primarily upon Wright's subjective

allegations.  (Tr. 26).  These were not permissible reasons to discount the information supplied

by Wright, particularly without first contacting Wright or attempting to obtain her treatment

records.  *See Jones v. Colvin*, 2015 WL 4628972 at *5; *Griffith v. Astrue*, 2009 WL 909630, *8

(W.D.N.Y. 2009) ("[n]or, despite the ALJ's finding, was it improper for [the treating physician]

to rely on [p]laintiff's subjective complaints in forming his opinion") (citing *Green-Younger v.*

*Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) ("[t]he fact that [the doctor] also relied on [plaintiff's]

subjective complaints hardly undermines his opinion as to her functional limitations, as a

patient's report of complaints, or history, is an essential diagnostic tool")).

      The information contained in Wright's letter, if credited, should have prompted

the ALJ to further develop the record.  In reaching his RFC assessment, the ALJ accorded "great

weight" to the opinion of Finnity, the examining consultant.  (Tr. 26).  Yet Finnity examined and

rendered an opinion of Welsh's limitations in June 2012, prior to the significant deterioration of

her mental status described above.  Under such circumstances, Finnity's opinion cannot

constitute substantial evidence supporting the ALJ's determination.  *See Jones*, 2015 WL

4628972 at *5 (ALJ improperly gave significant weight to consultative physicians who "did not

have before them approximately four years of [p]laintiff's medical records, including records

relat[ing] to [p]laintiff's second heart attack"); *Girolamo v. Colvin*, 2014 WL 2207993, *8

(W.D.N.Y. 2014) (ALJ improperly relied upon opinions of consulting physicians rendered "prior

to [p]laintiff's second surgery in 2011 and the related diagnostic testing associated therewith");

*Acevedo v. Astrue*, 2012 WL 4377323, *16 (S.D.N.Y.) ("[t]he timeliness of evidence is also a

factor that courts have cited in finding a lack of substantial evidence in the record to affirm a

decision on benefits by the Commissioner[;] . . . [t]his is particularly true where the stale

evidence relates to an RFC assessment that was completed before a full medical history was

developed"), *report and recommendation adopted*, 2012 WL 4376296 (S.D.N.Y. 2012); *Griffith

v. Astrue*, 2009 WL 909630 at *9 n.9 ("[t]he State Agency Officials' reports, which are

conclusory, stale and based on an incomplete medical record are not substantial evidence").

Indeed, the ALJ recognized the limited value to be accorded to a medical opinion that predated

Welsh's decline when he discounted the limitations assessed by Inman-Dundon because that

opinion was rendered without the benefit of the records revealing increased severity in Welsh's

mental health symptoms.  (Tr. 26 citing Exs. 1A and 2A).  The ALJ's determination to discount

Inman-Dundon's opinion for this reason is inconsistent with his determination to accord great

weight to Finnity's opinion, particularly because Finnity's opinion was rendered prior to

Inman-Dundon's.  (*Compare* Tr. 75-85 *with* Tr. 296-99).

       Under these circumstances, the ALJ should have developed the record by

requesting a medical opinion from Welsh's treatment providers, including Wright and Marino,

who apparently have a significant treating relationship with Welsh, or should have obtained

updated consulting opinions that account for the apparent decline in Welsh's mental health status

since July 2012.  In sum, I conclude that remand is appropriate for the ALJ to obtain medical

opinions and treatment records from Welsh's mental health providers and/or updated consulting

opinions.  "Because further development of the record may affect the ALJ's determinations

regarding [Welsh's] credibility and capability, [Welsh's] remaining arguments need not be

considered at this time." *Girolamo v. Colvin*, 2014 WL 2207993 at *9.


## CONCLUSION

Accordingly, the Commissioner's motion for judgment on the pleadings **(Docket # 13)** is **DENIED**, and Welsh's motion for judgment on the pleadings **(Docket # 8)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.  Specifically, upon remand the ALJ should attempt to identify and contact Welsh's mental health providers, including Wright and Marino, to obtain their records and medical source statements, should consider obtaining updated medical opinions from the consulting physicians, and should reevaluate Welsh's claim in light of any additional evidence provided.

**IT IS SO ORDERED.**


*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge


Dated: Rochester, New York
March 4, 2016


27